IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALLEN BROWN, | : | CIVIL ACTION |
|     Plaintiff, | : | |
| v. | : | |
| | : | |
| TROOPER BURGHART, *et al.*, | : | |
|     Defendants. | : | No. 10-3374 |

**MEMORANDUM**

P**RATTER**, J.                                                                                               M**AY** 25, 2012

**I**NTRODUCTION

    The facts in this case begin with a low-speed police chase and end tragically with Mr. Brown in the hospital, having caught on fire after the police officer Defendants attempted to subdue him by using their tasers in close proximity to of Mr. Brown's overturned motor scooter. Defendants now seek summary judgment, arguing that they did not use excessive force and that, even if they did, they are entitled to qualified immunity from liability due to the novelty of the circumstances in this case. They also seek to exclude the testimony of Plaintiff's police procedure expert.[1] The Court heard oral argument on March 8, 2012. For the reasons set forth below, the Court will grant in part and deny in part the defense "*Daubert* Motion" and will deny Defendants' Motion for Summary Judgment.

**F**ACTUAL **B**ACKGROUND

    The facts of this case are largely undisputed. At around 5:00 a.m. on August 24, 2008, Allen Brown left his home in Philadelphia and headed towards his mother's home in Norristown.

---

[1]     Defendants' motion is titled "Motion *in Limine*" but, as a motion to exclude expert testimony, it raises *Daubert* issues and will therefore be referred to throughout this opinion as a *Daubert* motion for the sake of clarity.

Mr. Brown did not own a car or have a driver's license, so he decided to ride a motor scooter that he had been repairing for a friend; the scooter did not have a license plate.  Mr. Brown knew he could take a bike trail near Ridge Pike in Conshohocken to get to his mother's house, but to get to the trail, he needed to first travel on the Schuylkill Expressway.

Defendant Trooper Justin LeMaire also happened to be on the Schuylkill Expressway in the early morning hours of the same day, as a part of his duties.  Heading west on the Expressway, he noticed a little red light.  When he drove closer, he saw that the light belonged to a motor scooter with no plates, ridden by a driver without a helmet or protective eyewear.  Trooper LeMaire responded by turning on his lights and siren, in attempt to effectuate a stop of the motor scooter.

Mr. Brown did not immediately pull over.  When he eventually did so, and Trooper LeMaire backed up his vehicle to pull over behind Mr. Brown, Mr. Brown took off and headed to Exit 332 of the Schuylkill Expressway.  What followed was a relatively low-speed chase.  Although there was then little traffic along the route, Mr. Brown did run a red light, swerve across the center line toward oncoming traffic, make at least one U-turn, and otherwise refuse to heed Trooper LeMaire's attempts to effectuate a traffic stop.

During the chase, Trooper LeMaire radioed for back-up.  The first responder was Defendant Trooper Peter Burghart, who joined the last few minutes of the chase.  In an attempt to evade the two police cars, Mr. Brown turned into an apartment complex, not realizing that the entrance to the complex was blocked by a cable.  Mr. Brown's impact with cable knocked him off of the motor scooter, and the scooter, riderless, skidded ahead and fell over.  Either when the scooter hit the cable or when it hit the ground, the gas cap of the scooter came off.  At some point

during the events that followed, gas leaked or spilled from the tank onto the scooter, the ground, and Mr. Brown.

Although the officers told Mr. Brown to stay down, Mr. Brown got up and ran towards the overturned motor scooter.[2]  Trooper Burghart then took Mr. Brown to the ground near the scooter and attempted to place him in handcuffs.  Mr. Brown resisted,[3] despite continued verbal commands from Trooper Burghart.  While Trooper Burghart continued to try to restrain Mr. Brown, Trooper LeMaire said, "Taser, taser, taser," and then deployed his taser in an attempt to immobilize Mr. Brown so that Trooper Burghart could apply handcuffs.  The taser caused Mr. Brown's body to momentarily lock up, but as soon as the current ended, Mr. Brown resumed his struggle.  Trooper LeMaire then used his taser three or four more times – at least once more remotely via probes and at least twice in "drive stun" mode (i.e., with the taser applied directly to Mr. Brown's body).  Each use of the taser lasted five seconds.  Mr. Brown still did not submit to the handcuffs.

As Trooper LeMaire tasered Mr. Brown, Trooper Burghart disengaged from the struggle and took out his own taser and again told Mr. Brown to get on the ground.  When he did not comply, Trooper Burghart deployed his taser,[4] causing Mr. Brown to fall to the ground.  What

---

[2]     All that Mr. Brown recalls after this point is that he did not obey the officers' commands and that he was tasered; he testified at his deposition that he blacked out and remembers nothing else until he awoke in the hospital.

[3]     Although Mr. Brown did not submit to handcuffing, the parties all agree that he did not directly punch, kick, or reach for the officers' weapons at any time during the ensuing struggle; nor was he in possession of a weapon.

[4]     The taser printouts from the Defendants' respective tasers show a five-minute gap between Trooper LeMaire's last use of his taser and Trooper Burghart's first use of his taser.

happened next is unclear.  Trooper Burghart testified that he told Mr. Brown to stay on the ground and place his hands behind his back, but that Mr. Brown ignored the command and got to his feet.  Mr. Brown does not recall this happening and points to a taser print-out which shows only a one second gap between Trooper Burghart's first and second deployment of the taser.

In any case, the parties agree that Trooper Burghart did then deploy his taser a second time while Mr. Brown was near the motor scooter, and flames engulfed Mr. Brown.  Prior to Trooper Burghart deploying his taser, there is no evidence that Trooper LeMaire told him to stop or that he in any way attempted to prevent or restrain Trooper Burghart from using his taser.[5]

Trooper LeMaire ran to get a fire extinguisher, returning to use the extinguisher to put out the fire that had also broken out on the motor scooter.  Trooper Burghart testified that he, meanwhile, told Mr. Brown to stop, drop, and roll, and that Mr. Brown did so, extinguishing the flames.  Mr. Brown does not recall receiving or obeying any such command but agrees that the flames were extinguished.  Trooper Burghart testified at his deposition that Mr. Brown then began to "half circle" him, and that Mr. Brown started making threats.  Mr. Brown does not recall this and questions Trooper Burghart's credibility as to these facts.  The parties do agree that Trooper Burghart then tasered Mr. Brown at least once more, that back-up officers arrived, and that eventually Mr. Brown was placed in handcuffs and taken to the hospital for treatment of his burn and other injuries.  Mr. Brown was later charged with multiple traffic violations,

---

[5] The State Police forensic service and fire marshal unit supervisor later investigated the scene and found no damage to the wiring or battery cables of the scooter or signs that the scooter overheated.  He could not determine the precise cause of the fire.  He posited that there was a "possibility" that the exhaust system of the motor scooter caused it or that the use of the taser in proximity to the scooter cause the fire.  In any event, the investigator could not find any factor weighing against the taser as the cause of the blaze.

receiving stolen property, and resisting arrest.  The charge of receiving stolen property was dismissed, and Mr. Burghart pleaded guilty to driving under the influence and fleeing and attempting to elude an officer.

Neither Trooper Burghart nor Trooper LeMaire had ever deployed their tasers in the field before encountering Mr. Brown.  In fact, they had each received taser training only a handful of months prior to the encounter – Trooper Burghart received training in March, 2008, and Trooper LeMaire received training in June 2008.  One topic discussed at the training was the potential of tasers igniting flammable materials.  For instance, the officers were trained that a taser could ignite certain types of alcohol-based pepper spray, chemicals present in methamphetamine labs, gasoline, gasoline vapors, and drinking alcohol.  Both officers testified that they were aware, prior to August 24, 2008, that a taser could ignite flammable materials such as gasoline or gasoline fumes and that gas leaks and/or spills are possible at the scene of a motor vehicle accident.  Neither officer gave a thought to the possibility of gasoline or gas vapors at the scene of Mr. Brown's arrest, however.  The officers were also trained that the application of the taser was subject to the same statutory and case law requirements as any other law enforcement tool and that reasonableness in the use of force depended on the totality of the circumstances.

In addition to their tasers, each of the law enforcement Defendants had two sets of handcuffs, pepper spray, and a baton with them at the scene of Mr. Brown's arrest.  Plaintiff's expert, whose opinion will be discussed in more detail below, opined that the officers could have used pepper spray or a baton to subdue Mr. Brown, or could have waited for the arrival of further back-up personnel.

LEGAL STANDARDS

    A.    *Daubert* Motions

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.

The Supreme Court, in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), imposed upon district courts the role of a gatekeeper, charging trial courts to "ensure that any and all scientific evidence is not only relevant, but reliable." *ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc.*, 198 F. Supp. 2d 598, 601-02 (E.D. Pa. 2002) (quoting *Daubert*, 509 U.S. at 589). When "faced with a proffer of expert scientific testimony . . . the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand and determine a fact in issue." *Id.* at 602 (quoting *Daubert*, 509 U.S. at 592). This gatekeeping function of the district court extends beyond scientific testimony to "testimony based on . . . 'technical' and 'other specialized' knowledge." *Id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)).

    B.    **Motions for Summary Judgment**

Upon motion of a party, summary judgment is appropriate if, "citing to particular parts of

materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials," the moving party persuades the district court that "there exists no genuine issue of material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Miller v. Ind. Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988).

In evaluating a summary judgment motion, the court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). If, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine issue of material fact, summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 217, 322 (1986); *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

DISCUSSION

    A.    *Daubert* Motion

Federal Rule of Evidence 702 provides "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability and fit." *Id.* (quoting *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000)). The party offering the expert testimony has the burden of establishing that the proffered testimony meets each of the three requirements by a preponderance of the evidence. *Id.* (citing *Paldillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999)).

In their *Daubert* Motion, Defendants take issue with several of the opinions expressed by Dr. John G. Peters, Plaintiff's expert on police procedure. Their argument largely seems to challenge whether Dr. Peters is qualified to opine on certain subjects and whether his testimony

goes to the ultimate issues in the case. Much of their argument stems from Dr. Peters's notable overuse of the phrase "in my professional opinion," even though the material following that phrase typically is not actually an "opinion." Indeed, many of those "opinions" are more accurately and aptly characterized as background facts. Even Mr. Brown concedes that they do not actually qualify as opinions.

For instance, Defendants contend that Dr. Peters should not be permitted to opine as to whether there were several warnings extant as of before August 28, 2008 about not using tasers near flammable and/or combustible materials. Mr. Brown agrees that this is a statement of background fact, not an opinion. The same is true of Dr. Peters's statements regarding what the Defendants *personally* did, knew, and thought at the time of the incident – these "opinions," Mr. Brown concedes, are simply a recitation of record facts upon which Dr. Peters's actual opinion relies. Moreover, Mr. Brown admits that, to the extent Dr. Peters seems to be offering an opinion as to the actual cause of the fire, he is not qualified to do so, and Mr. Brown concedes, as he must, that Dr. Peters overstepped his bounds resorting to hyperbole by calling the taser use in this case "torture." To the extent that Dr. Peters "opines" as to the actual facts of the case, offers testimony as to the cause of the fire, and employs unnecessary hyperbole to describe Defendants' conduct, Dr. Peters's testimony will be excluded.[6]

However, Dr. Peters will be allowed to offer opinions as to whether Mr. Brown was an immediate threat, whether the officers had other options aside from tasers available to them at the

---

[6] This does not, obviously, prohibit Dr. Peters from discussing the facts on which his opinion relies – the Court simply admonishes him from casually and inaptly invoking the phrase "in my professional opinion" to introduce his further commentary.

8

time of the incident, and as to the proper procedures for taser use – i.e., opinions relating to general police procedures and standards to which officers adhere and how, in his opinion, they apply to the facts of this case.  Defendants do not contend that Dr. Peters is unqualified as an expert on police procedures, and testimony about those standards and procedures could be helpful to a jury in evaluating the facts of this case.

Dr. Peters will not, however, be permitted to testify as to the ultimate issue in this case – whether the Defendants' use of force was excessive or unreasonable.  *See Damiani v. Momme*, Civil Action No. 11-2534, 2012 WL 1657920, at *2 (E.D. Pa. May 11, 2012) (expert in excessive force case may not "offer his opinion that the officers' conduct was unnecessary, punitive, [or] abusive" because such testimony "answers the very question tasked to the jury, and the Court will not permit an expert to invade the province of the jury"); *Tschappat v. Groff*, Civil Action No. 3:CV–01–2279, 2004 WL 5509087, at *4 (M.D. Pa. June 2, 2004) (plaintiff's expert "permitted to testify if, in his opinion, [the defendant's] conduct was in conformance with standard police procedures based on his extensive law enforcement background," but not about whether the defendant's "use of force in [that] case was unreasonable and excessive").  To allow such testimony would allow Dr. Peters to invade the rightful province of the jury, and this the Court cannot permit.

      **B.**    **Motion for Summary Judgment**

Troopers Burghart and LeMaire argue that they did not use an unreasonable amount of force on Mr. Brown when they arrested him, and that therefore they did not violate his Fourth Amendment rights.  They also argue that they are entitled to qualified immunity.  The Court will consider the claim in this regard as to each Defendant in turn.

*1.     Trooper LeMaire*

As an initial matter, it is unclear as to what, exactly, Mr. Brown contends that Trooper LeMaire did wrong. In setting forth the actual counts brought against the Defendants, the Complaint alleges that each officer used excessive force in deploying their tasers multiple times in the presence of flammable liquid. *See* Compl. at ¶¶ 21, 27; *see also* 3/8/12 Oral Argument Tr. at 45:1-8 ("THE COURT: . . . This case . . . is exclusively resting on the issue of the obvious presence of the flammable liquid at the site where the Taser's being used. Am I correct? [Plaintiff's counsel]: . . . That's correct, Your Honor.").[7] However, the parties' statements of undisputed facts, filed at the Court's request to clarify the factual issues in the case, never mention precisely where Mr. Brown was in proximity to the motor scooter when *Trooper LeMaire* used his taser (i.e., they do not seem to address whether this Defendant's taser use actually put Mr. Brown at risk of catching afire), while Mr. Brown's proximity to the overturned scooter is discussed in detail with respect to *Trooper Burghart*'s taser use.

Even if the facts as set forth did allow the Court to conclude that Trooper LeMaire's conduct did create a risk of fire, neither party addressed at all the legal significance, if any, of creating a risk that never materialized and therefore did not result in any damages. Defendants' briefing focuses on whether the Defendants collectively can be held liable for Mr. Brown's fire-related injuries, without addressing the difference in the Defendants' respective circumstances.

---

[7]     There are mentions that Trooper LeMaire, instead of using his taser multiple times, should have used it once but for a long enough period of time to allow his colleague to successfully handcuff Mr. Brown, but, again, the Complaint does not say that the claim is about using the taser too many times, Mr. Brown's attorney clarified at oral argument that that is not what this case is about, and Mr. Brown's injuries stem from being set on fire, not actually from mutliple taser uses.

Their arguments do fully address Trooper Burghart's position, but leave the Court with unanswered questions as to Trooper LeMaire's status in this case.

To add to the imprecision, Mr. Brown's opposition and his counsel's statements at oral argument abandon the theory of the case set forth in the Complaint and, in an effort to hold Trooper LeMaire accountable for Mr. Brown's burns, suggest that the claim against Trooper LeMaire is no longer based on his use of a taser, but rather on his failure to stop Trooper Burghart from using his taser when Mr. Brown was near the motor scooter. *See* Pl.'s Opp. at 16 ("Trooper Burghart should not have deployed his taser at all and Trooper LeMaire should have warned him not to deploy the taser."); Pl.'s Opp., Ex. B, Expert Report of Dr. John G. Peters, at 10 ("Trooper LeMaire failed to intervene and stop Trooper Burghart in using deadly force on Mr. Brown . . ."). However, Plaintiff's counsel admitted at oral argument that the Complaint does not include a claim against Trooper LeMaire for failure to intervene and that he would need to ask to amend the Complaint to assert such a claim. 3/8/12 Tr. at 35:2-17. To date, no such motion for leave to amend the Complaint has been filed. Moreover, Defendants' summary judgment briefing does not address this new theory of liability, as it does not even mention in its reply to Plaintiff's Opposition the issue of Trooper LeMaire's failure to stop Trooper Burghart from using his taser.

Because of this lack of clarity surrounding Trooper LeMaire's status in this case, the Court will deny the motion for summary judgment as to Trooper LeMaire without prejudice, so that the parties can properly and specifically outline the facts and law concerning Trooper LeMaire's potential liability in this case.

      2.     *Trooper Burghart*

         a.     *Section 1983*

The federal civil rights statute, 42 U.S.C. § 1983, allows challenges of a state's "deprivation of any rights ... secured by the Constitution." Section 1983 was enacted during post-Civil War Reconstruction, and was designed "to interpose the federal courts between the states and the people, as guardians of the people's federal rights." *Mitchum v. Foster*, 407 U.S. 225, 242 (1972). It is not itself a source of substantive rights, "but a method for vindicating federal rights elsewhere conferred ... ." *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979).

In order to make out a *prima facie* case against an individual under § 1983, a plaintiff must show (1) that this person deprived him or her of a federal right; and (2) that in doing so, this person was acting under color of state or territorial law. *Edwards v. City of Philadelphia*, 860 F.2d 568, 573 (3d Cir. 1988) (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)). The parties do not dispute that Trooper Burghart was acting under color of state law when the officers arrested Mr. Brown, so the arguments in this case center on the first element of what is required in order to make out a *prima facie* case.

A claim, like the one in this case, that a law enforcement officer used excessive force in the course of an arrest, investigatory stop, or other seizure is analyzed under the Fourth Amendment "reasonableness" standard. *Graham v. Connor,* 490 U.S. 386, 395 (1989). In analyzing such a claim, a court must determine whether an officer's actions were reasonable "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight .... the question is whether the [officer's] actions are 'objectively reasonable' in light of the facts and circumstances confronting [the officer], without regard to their underlying intent or

12

motivation." *Graham,* 490 U.S. at 396-97 (internal citations omitted). A reasonableness inquiry therefore "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396 (internal citations omitted). *See also Metzger by Metzger v. Osbek,* 841 F.2d 518, 520 (3d Cir. 1988). The Third Circuit Court of Appeals has listed other relevant factors, including the duration of the officer's action; whether the action takes place in the context of effecting an arrest; and whether the force applied was of such an extent as to lead to injury. *Sharrar v. Felsing,* 128 F.3d 810, 822 (3d Cir. 1997), *abrogated on other grounds by Curley v. Klem*, 499 F.3d 199 (3d Cir. 2007).

    Whether the amount of force applied by an officer was reasonable is normally an issue for the jury. *Rivas v. City of Passaic* 365 F.3d 181, 198 (3d Cir. 2004). However, a court may grant summary judgment in a case such as this, if it concludes, after resolving all factual disputes in favor of the non-moving plaintiff, that the officer's use of force was objectively reasonable under the circumstances. *Estate of Smith v. Marasco,* 318 F.3d 497, 516 (3d Cir. 2003). Trooper Burghart argues that Mr. Brown was fleeing the police, driving recklessly and endangering others,[8] resisting the efforts to place him in handcuffs, and continuing to resist arrest after physical force and a taser were used *and* even after he had caught on fire. He argues that given all of this, the level of force used was justified, and the fire was merely an unfortunate and unforeseen accident.

---

[8] Plaintiff disputes whether he was endangering anyone other than himself, pointing out that there were very few other cars on the road at the time of the chase.

In support of this argument that he should not be held responsible for Mr. Brown's extraordinary injuries, Trooper Burghart cites *McKenney v. Harrison*, 635 F.3d 354 (8th Cir. 2011). In *McKenney*, two officers entered a house to execute an arrest warrant issued for various misdemeanors. *Id.* at 357. At some point after the police found the suspect and asked him to get dressed, the suspect suddenly lunged toward a window in an effort to escape. The officer standing between him and the window used her taser on the suspect before he reached the window. Thereafter, the suspect jumped or fell out of the window, and he eventually died from his injuries. *Id.*

In *McKenney*, the Eighth Circuit Court of Appeals held that even though the officers knew that a taser created a risk of falling if someone is tased when in an "elevated position," the fact that the officer tased the suspect *before* he reached the window made his death an unforeseeable consequence of the tasing, in that the reasonable officer could have believed that a taser would incapacitate the subject before he reached the window, i.e., would have stopped the subject in his tracks. Therefore, the court held, the force used was not excessive. *Id.* at 360.

The facts in *McKenney* can be distinguished from the facts here, however. In this case, a fire, while perhaps unforeseen by these officers, may well have been *foreseeable* by a reasonable officer, unlike the not-reasonably-foreseeable consequence of taser use in the *McKenney* case. Indeed, a much more apt comparison can be made between the facts in this case and the facts in *Snauer v. City of Springfield*, No. 09-CV-6277-TC, 2010 WL 4875784 (D. Or. Oct. 1, 2010), *report and recommendation adopted by district judge,* 2010 WL 4861135 (D. Or. Nov. 23, 2010). In that case, a police officer gave chase to a suspect who had violated a traffic law, got out of his vehicle, and attempted to evade police by running through an apartment complex. As

14

the suspect climbed and reached the top of a six- to seven-foot fence, the officer tased him, causing him to plunge head-first to the other side of the fence and sustain multiple spinal fractures. *Id.* at *2. The court then refused to grant summary judgment to the officer. Thus, the *Snauer* fact pattern presented a situation in which a substantial risk of serious injury was, perhaps, unforeseen, but certainly foreseeable to an objectively reasonable officer at the scene.

Although the court in *Snauer* primarily addressed the officer's qualified immunity argument, and specifically whether case law clearly established a violation of the suspect's rights at the time of the tasering, the court rejected the officer's contention that he had used merely an "intermediate level of force" in attempting to effect an arrest. Rather, the court held that the level of force used must take into account the totality of the circumstances, not simply the type of force usually associated with a particular weapon. *Id.* at *4-5. The court used the example of a mere shove – in a normal situation, a shove would be a very insignificant amount of force, but when a suspect is perched on a ledge of a building, a shove can be deadly force. *Id.* at *4.

The same is true here. The totality of the circumstances include the presence of an overturned motor scooter leaking gasoline. It is true that Defendants testified during depositions that neither of them knew about the gas leak. Contrary to Defendants' arguments, that testimony does not definitively end the inquiry in this case. A reasonable jury would be entitled to make a credibility determination by weighing the Defendants' testimony against the other evidence in this case and to disbelieve that testimony in light of the officers' proximity to the overturned vehicle and their testimony that they knew of the risk of gasoline spills at the site of vehicle accidents. Moreover, a reasonable jury could find that regardless of what Defendants subjectively observed, an objectively reasonable officer presented with the circumstances would

have been cognizant of the risk of a gasoline spill or checked for a spill before using a taser.

Just as a reasonable jury could find that Trooper Burghart did or should have recognized the risk associated with using a taser near an overturned vehicle leaking gasoline, the same jury could find that the Plaintiff's behavior did not warrant a use of force that created a risk of fire and serious injury.[9] It is undisputed that Mr. Brown was unarmed, did not directly attempt to harm or threaten the officers, and had only been observed committing traffic offenses and evading arrest. The bottom line in this case, then, is that, drawing all inferences in favor of Mr. Brown as the Court must do at this stage, there is a jury question as to whether an objectively reasonable officer would have acted in the same way as Trooper Burghart did. Therefore, summary judgment is inappropriate.

### b. Qualified Immunity

Even if a plaintiff has made out a *prima facie* case under § 1983 by showing that an officer deprived him or her of a federal right while acting under color of state law, the officer may be entitled to qualified immunity. Under the qualified immunity doctrine, law enforcement officers acting within their professional capacity are immune from suit "insofar as their conduct

---

[9] Indeed, knowingly using of a taser near flammable material could be construed as a use of deadly force. The Third Circuit Court of Appeals has adopted the Model Penal Code definition of deadly force: "force which the actor uses with the purpose of causing *or which he knows to create a substantial risk* of causing death or serious bodily harm." *See In re City of Philadelphia Litig.*, 49 F.3d 945 (3d Cir. 1995) (citing Model Penal Code § 3.11(2) (1994)) (emphasis added). Certainly, a risk of catching a person on fire is a risk of death or serious bodily harm. Trooper Burghart does not contend that he was entitled to use deadly force on Mr. Brown. It is well-established that the use of deadly force is only appropriate "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others," such as "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm." *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985).

does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne*, 526 U.S. 603 (1999) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The first step in a qualified immunity analysis is determining "whether the plaintiff has alleged the deprivation of an actual constitutional right at all." *Conn v. Gabbert*, 526 U.S. 286 (1999).  If there has been no violation, then further analysis is unnecessary.  The plaintiff bears the burden of proof on the question of whether a constitutional violation occurred. *Henry v. Purnell*, 501 F.3d 374, 377-78 (4th Cir. 2007) (*citing Bryant v. Muth*, 994 F.2d 1082, 1086 (4th Cir. 1993)).  As already discussed, Mr. Brown has proffered enough evidence to raise genuine issues of material fact as to whether Trooper Burghart violated his constitutional right. Thus, the Court turns to whether that right was clearly established at the time of the events in question.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  This inquiry "must be undertaken in light of the specific context of the case." *Id.* at 201.  "Therefore, to decide whether a right was clearly established, a court must consider the state of the existing law at the time of the alleged violation and the circumstances confronting the officer to determine whether a reasonable state actor could have believed his conduct was lawful." *Kelly v. Borough of Carlisle*, 2010 U.S. App. LEXIS 20430 at *8-9 (3d Cir., October 4, 2010) (*citing Anderson v. Creighton*, 483 U.S. 635, 641 (1987); *Berg v. County of Allegheny*, 219 F.3d 261, 272 (3d Cir. 2000); *Paff v. Kaltenbach*, 204 F.3d 425, 431 (3d Cir. 2000)).  Qualified immunity is an affirmative defense, and an officer asserting it therefore bears the burden of proving its applicability to his or her case. *Thomas v.*

*Independence Twp.*, 463 F.3d 285, 292 (3d Cir. 2006).

Trooper Burghart points to the paucity of case law involving taser use and argues that, even if he did violate Mr. Brown's constitutional rights, those rights were not clearly established at the time of the events in question. He argues that Mr. Brown can cite to no case law that requires officers to actively check for flammable materials before using a taser.[10]  Mr. Brown counters that the right to be free from excessive force is a clearly established right and that Trooper Burghart knew that under certain circumstances, such as in the presence of flammable liquid, the use of a taser could be excessive (i.e., that the use of lethal force was clearly uncalled-for in the situation).

Trooper Burghart is correct that the case law on taser use is still developing, as it is a relatively new weapon, and the reported cases are by and large highly fact specific.[11]  In support of their argument that this entitles him to qualified immunity, Trooper Burghart cite *Ickes v. Borough of Bedford*, 807 F. Supp. 2d 306 (W.D. Pa. 2011).  In that case, an officer twice tased the plaintiff, a man in his 70s who refused to comply with the officer's orders.  The court held that even if the plaintiff's Fourth Amendment rights were violated, the officer was entitled to qualified immunity because the right to be free from tasing when resisting arrest was not clearly established.  The court ignored the plaintiff's argument that the right to be free from excessive force generally is clearly established and instead chastised the plaintiff for failing to point to any

---

[10]     It is true that there does not appear to be any case law in any jurisdiction addressing tasers and flammability risks.

[11]     At the time of Mr. Brown's arrest in 2008, there do not appear to have been any Third Circuit Court of Appeals decisions regarding taser use.

decision of a federal appellate court "holding that the Fourth Amendment prohibits a police officer from using a taser to subdue a suspect who is actively resisting arrest." *Id.* at 323.

According to the Third Circuit Court of Appeals, however, "[w]hile [the Court] cannot expect executive officials to anticipate the evolution of constitutional law, neither can [the Court] be faithful to the purposes of immunity by permitting such officials one liability-free violation of a constitutional or statutory requirement. Insisting on a precise factual correspondence between the conduct at issue and reported case law is tantamount to such a license." *People of Three Mile Island Through Three Mile Island Alert, Inc. v. Nuclear Regulatory Com'rs,* 747 F.2d 139, 145 (3d Cir. 1984). To the extent *Ickes* can be read to suggest that a "precise factual correspondence" is *required* before a right can be said to be clearly established, well-established appellate precedent demonstrates that this reading stretches *Ickes* too far.

The Third Circuit Court of Appeals has held that "[i]n extraordinary cases, a broad principle of law can clearly establish the rules governing a new set of circumstances if the wrongfulness of an official's action is so obvious that 'every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.'" *Schneyder v. Smith*, 653 F.3d 313, 330 (3d Cir. 2011) (quoting *Vinyard v. Wilson,* 311 F.3d 1340, 1351 (11th Cir. 2002)). This is one of those cases.

In this case, viewing the facts, as required, in the light most favorable to Plaintiff, the record shows that Trooper Burghart had received training that a taser, when used in the presence of flammable material including gasoline or gasoline vapors, creates a risk of fire. Indeed, Trooper Burghart was even trained that the risk was serious enough that he should ask other police officers whether their pepper spray contains alcohol before deploying a taser in the

19

presence of such spray and that he should not use tasers in flammable situations such as in a meth lab. Given this express training, the presence of an overturned vehicle obviously leaking gasoline at the scene of Mr. Brown's arrest, and Mr. Brown's proximity to that vehicle when Trooper Burghart deployed his taser, an officer familiar with legal precedent regarding the amount of force appropriate in the case of (1) an unarmed, but resisting suspect (2) who was not attempting to harm officers and, (3) aside from resisting arrest, had only committed traffic violations surely would not conclude that conduct risking lighting that suspect on fire was an appropriate amount of force. Indeed, "the police do not need judges to explain the obvious to them before they can be held accountable for an unreasonable or excessive use of force." *Snauer*, 2010 WL 485784, at *5. Therefore, Trooper Burghart is not entitled to qualified immunity.

### CONCLUSION

For the foregoing reason, Defendants' Motion for Summary Judgment will be denied as to Trooper Burghart and denied without prejudice as to Trooper LeMaire, and Defendants' Motion *in Limine* to Exclude Plaintiff's Expert Dr. John Peters will be granted in part and denied in part. An appropriate Order follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE