IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| ALLEN BROWN, | : | CIVIL ACTION |
|---|---|---|
| Plaintiff, | : | |
| v. | : | |
| | : | |
| TROOPER BURGHART, *et al.*, | : | |
| Defendants. | : | No. 10-3374 |

## MEMORANDUM

PRATTER, J.                                                                                             APRIL 3, 2013

### INTRODUCTION

This is the second time the Court has dealt with a summary judgment challenge to Allen Brown's § 1983 claim against Defendant Trooper Justin LeMaire. As noted in the Court's May 25, 2012 opinion, the Complaint and summary judgment arguments left unclear what, precisely, Mr. Brown contended that Trooper LeMaire did or failed to do. *Brown v. Burghart*, Civil Action No. 10–3374, 2012 WL 1900603, at *5-6 (E.D. Pa. May 25, 2012). After that opinion, Mr. Brown filed an Amended Complaint (Docket No. 28), clarifying that his claim against Trooper LeMaire centered on the officer's failure to prevent Trooper Burghart from using excessive force. Trooper LeMaire then filed a new summary judgment motion, to which Mr. Brown has responded. Just as the Court found that fact issues exist precluding the grant of summary judgment to Trooper Burghart, the Court now also finds that genuine issues of material fact preclude granting Trooper LeMaire his requested relief.

### FACTUAL BACKGROUND

Because this Court has already set forth the undisputed facts of this case in some detail in its May 25, 2012 opinion, the following recitation of facts will be brief.

In the early morning hours of August 24, 2008, Trooper Justin LeMaire, while driving on the Schuylkill Expressway as a part of his duties, noticed a motor scooter with no plates, ridden by a driver without a helmet or protective eyewear – Mr. Allen Brown. A relatively low-speed chase ensued, during which Trooper LeMaire radioed for backup. The first responder was Trooper Peter Burghart, who joined the last few minutes of the chase. In an attempt to evade the two police cars, Mr. Brown turned into an apartment complex, not realizing that the entrance to the complex was blocked by a cable. Mr. Brown's interaction with the cable knocked him off of the motor scooter, and the scooter, now riderless, skidded ahead and fell over. Either when the scooter hit the cable or when it hit the ground, the gas cap of the scooter came off. At some point during the events that followed, gas leaked or spilled from the tank onto the scooter, the ground, and Mr. Brown.

Although the officers told Mr. Brown to stay down, Mr. Brown got up and ran towards the overturned motor scooter.[1] A struggle between Mr. Brown and Trooper Burghart ensued, during which Trooper LeMaire repeatedly used his taser on Mr. Brown. Each use of the taser lasted five seconds. Mr. Brown still did not submit to handcuffs.

As Trooper LeMaire tasered Mr. Brown, Trooper Burghart disengaged from the struggle and took out his own taser and again told Mr. Brown to get on the ground. When he did not comply, Trooper Burghart deployed his taser,[2] causing Mr. Brown to fall to the ground. What happened next is unclear. Trooper Burghart testified that he told Mr. Brown to stay on the ground and to place his hands behind his back, but that Mr. Brown ignored the command and got

---

[1] All that Mr. Brown recalls after this point is that he did not obey the officers' commands and that he was tasered; he testified at his deposition that he blacked out and remembers nothing else until he awoke in the hospital.

[2] The taser printouts from the Defendants' respective tasers show approximately a 4-minute gap between Trooper LeMaire's last use of his taser and Trooper Burghart's first use of his taser.

2

to his feet. Mr. Brown does not recall this happening. In any event, Trooper Burghart tasered Mr. Brown again. A taser print-out shows an eight-second gap between Trooper Burghart's first and second deployment of the taser.[3] After this second tasering, flames engulfed Mr. Brown. Prior to Trooper Burghart deploying his taser, there is no evidence that Trooper LeMaire told his colleague to stop or that he in any way attempted to prevent or restrain Trooper Burghart from using his taser.[4]

Neither Trooper Burghart nor Trooper LeMaire had ever deployed their tasers in the field before encountering Mr. Brown. In fact, they had each received taser training only a handful of months prior to the encounter – Trooper Burghart received training in March 2008, and Trooper LeMaire received training in June 2008. One topic discussed at the training was the potential of tasers igniting flammable materials. For instance, the officers were trained that a taser could ignite certain types of alcohol-based pepper spray, chemicals present in methamphetamine labs, gasoline, gasoline vapors, and drinking alcohol. Both officers testified that they were aware, prior to August 24, 2008, that a taser could ignite flammable materials such as gasoline or gasoline fumes and that gas leaks and/or spills are possible at the scene of a motor vehicle accident. Neither officer gave a thought to the possibility of gasoline or gas vapors at the scene of Mr. Brown's arrest, however. The officers were also trained that the application of the taser was subject to the same statutory and case law requirements as any other law enforcement tool and that reasonableness in the use of force depended on the totality of the circumstances.

---

[3] In the Court's May 25, 2012 opinion, the Court recounted that the gap between Trooper Burghart's first and second taser use was only one second, but the taser printouts show that it was eight seconds.

[4] The State Police forensic service and fire marshal unit supervisor later investigated the scene and found no damage to the wiring or battery cables of the scooter or signs that the scooter overheated. He could not determine the precise cause of the fire. He posited that there was a "possibility" that the exhaust system of the motor scooter caused it or that the use of the taser in proximity to the scooter caused the fire. In any event, the investigator could not find any factor weighing against the taser as the cause of the blaze.

**LEGAL STANDARD**

Upon motion of a party, summary judgment in a federal case is appropriate if, "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials," the moving party persuades the district court that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a), (c); *Miller v. Ind. Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988).

In evaluating a summary judgment motion, the court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). If, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine issue of material fact, summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 217, 322 (1986); *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

**DISCUSSION**

The federal civil rights statute, 42 U.S.C. § 1983, allows challenges of a state's "deprivation of any rights ... secured by the Constitution." Section 1983 was enacted during post-Civil War Reconstruction, and was designed "to interpose the federal courts between the states and the people, as guardians of the people's federal rights." *Mitchum v. Foster*, 407 U.S. 225, 242 (1972). It is not itself a source of substantive rights, "but a method for vindicating federal rights elsewhere conferred . . ." *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979).

In order to make out a *prima facie* case against an individual under § 1983, a plaintiff must show (1) that this person deprived him or her of a federal right; and (2) that in doing so, this person was acting under color of state or territorial law. *Edwards v. City of Philadelphia*, 860

F.2d 568, 573 (3d Cir. 1988) (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)). The parties do not dispute that Trooper LeMaire was acting under color of state law when the officers arrested Mr. Brown.

> Courts have held that a police officer has a duty to take reasonable steps to protect a victim from another officer's use of excessive force . . . If a police officer . . . fails or refuses to intervene when a constitutional violation . . . takes place in his presence, the officer is directly liable under Section 1983. However, an officer is only liable if there is a realistic and reasonable opportunity to intervene.

*Smith v. Mensinger*, 293 F.3d 641, 650-51 (3d Cir. 2002) (internal quotations and citations omitted).

This Court has already held, and reaffirmed in ruling on Trooper Burghart's motion for reconsideration, that there are genuine issues of material fact as to whether Trooper Burghart violated Mr. Brown's constitutional rights when he deployed his taser in the presence of leaking gasoline, and that Trooper Burghart is not entitled to qualified immunity because "an officer familiar with legal precedent regarding the amount of force appropriate in the case of (1) an unarmed, but resisting suspect (2) who was not attempting to harm officers and, (3) aside from resisting arrest, had only committed traffic violations surely would not conclude that conduct risking lighting that suspect on fire was an appropriate amount of force." *Brown*, 2012 WL 1900603, at *11.

Trooper LeMaire had the same opportunities to assess the situation as Trooper Burghart, so despite his attempts to reargue whether the use of a taser under these circumstances violated Mr. Brown's rights and whether the law was or was not clearly established for purposes of qualified immunity,[5] the only real issue remaining here is whether there are material factual

---

[5] Because both of these issues were previously decided by this Court as to Trooper Burghart, *see Brown*, 2012 WL 1900603, it follows that if Trooper LeMaire had a reasonable opportunity to intervene, the same legal analysis with respect to the underlying constitutional violation alleged to have been committed by Trooper Burghart would apply to Trooper LeMaire, both with respect to whether a

disputes as to whether Trooper LeMaire had an opportunity to intervene. Here, Trooper LeMaire had slightly over four minutes between the last time he tasered Mr. Brown and Trooper Burghart's first taser deployment, and he had eight seconds between the first and second time Trooper Burghart used his taser during which Trooper LeMaire could have advised Trooper Burghart to refrain from tasering Mr. Brown.

Trooper LeMaire argues, without citing to any case law, that Mr. Brown must show "unequivocally" that Trooper LeMaire knew that there was spilled gasoline in order to hold him responsible for failing to intervene here. However, as previously discussed by this Court, the standard is not whether he subjectively knew about the gasoline, but what an objectively reasonable officer would have done under the same circumstances. Those circumstances included an overturned motor scooter, the knowledge that vehicle accidents may result in gasoline spills, and the knowledge that using a taser in the presence of flammable material causes a fire risk.[6] *See Brown*, 2012 WL 1900603, at *7-9. Here, Trooper LeMaire arguably had two windows of opportunity to prevent his companion from using his taser under the dangerous circumstances facing the officers and Mr. Brown – the four minutes between his last taser use and Trooper Burghart's first, and the eight seconds between Trooper Burghart's first and second taser uses. There is no evidence that he did so or attempted to do so. Whether or not these two windows of time were enough to give Trooper LeMaire a reasonable opportunity to intervene is

---

constitutional violation was potentially committed and whether the law was clearly established with respect to a qualified immunity analysis.

[6] Trooper LeMaire argues that officers do not have to consider "environmental" factors in deciding what level of force is appropriate. He cites no case law holding this, and in making this sweeping statement, he seems to ignore clearly established case law holding that an officer must consider the *totality* of the circumstances when assessing the level of force appropriate. *See Graham v. Connor*, 490 U.S. 386, 396 (1989).

a question for the factfinder. Thus, the Court will not grant summary judgment in favor of Trooper LeMaire.

**CONCLUSION**

For the foregoing reason, Defendant's Motion for Summary Judgment will be denied. An appropriate Order follows.

BY THE COURT:


<u>S/Gene E.K. Pratter</u>
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE